144 So.2d 21

**Ann T. NORMAN**

v.

**W. L. HUBERT.**

3 Div. 957.

Supreme Court of Alabama.

Aug. 30, 1962.

George P. Howard and William B. Dunn, Wetumpka, for appellant.

Taylor & Newby and W. Clarence Atkeison, Prattville, for appellee.

HARWOOD, Justice.

This is an appeal from a judgment in the proponent's favor in a will contest.

Mr. L. A. Threatt died on 30 March 1960. Surviving him as next of kin were his three daughters, Mrs. Annie Myra Norman of Chicago, Illinois, Mrs. Ione Spangler of Montgomery, Alabama, and Mrs. Josephine Ruffin of Wetumpka, Alabama, all of whom were over 21 years of age at the time of their father's death.

Mr. Threatt left an estate of around $120,000. To each of his daughters respectively he bequeathed a house and lot. The residue of his estate he bequeathed to his grandson, W. L. Hubert, whom he also nominated as executor of his will.

Upon the will being offered for probate, a contest of the will was filed by Mrs. Spangler and Mrs. Norman, and upon demand the matter of the probate of the will was transferred to the Circuit Court of Autauga County.

The grounds of the contest were that the purported will was not duly executed by L. A. Threatt; that L. A. Threatt was mentally incompetent to execute a will at the time that the purported will is alleged to have been executed; and that the execution of the purported will was procured by undue influence exercised on L. A. Threatt by W. L. Hubert, who is the chief beneficiary in the purported will and who was appointed executor thereunder.

For the proponents, Dr. Walter Till, a physician of Prattville, Alabama, testified that L. A. Threatt had been a patient of his for approximately two years preceding his death. Mr. Threatt had had diabetes for over ten years, accompanied by hardening of the arteries, and moderate conges-

tive heart failure, a mild cirrhosis of the liver, and some kidney damage, the latter diseases being conditions of the diabetes.

In February 1960, Mr. Threatt had developed a gangrenous condition in one of his feet and was hospitalized therefor several days before 29 February 1960, the date of the will.

During this stay in the hospital Dr. Till concluded that the leg would have to be amputated.

While on his rounds of the hospital on the morning of 29 February 1960, between 9:30 and 10:00 A.M., Dr. Till was requested to witness Mr. Threatt's will. When he entered Mr. Threatt's room Mr. J. B. Burt, minister of the Prattmont Baptist Church was in the room. Dr. Till remembered seeing Mr. Hubert outside the room though he did not recall whether any other people were in the room at the time he entered. Dr. Till was positive however that at the time Mr. Burt read the will to the deceased that only he, Mr. Burt, and deceased were in the room. Mr. Burt read the will to the deceased, who asked one or two questions about the terms of the will, and upon Mr. Burt rereading these terms announced his satisfaction with the instrument. Dr. Till testified that he was present when the will was executed, and that he signed his name as attesting witness.

Dr. Till further testified that at the time the will was executed the deceased was perfectly lucid and carrying on a reasonable conversation, and in his opinion was of sound mind.

Mr. Burt testified that he had visited the deceased in the hospital several times during his illness. The day before the will was executed Mr. Burt had visited the deceased, and learning that he was to undergo surgery asked him if his business was in order and if he had made a will. The deceased replied he had discussed it with his lawyer.

The next day Mr. Burt was called to the hospital to witness the will. At the hospital he was given the will by Mr. Hubert. Mr. Burt further testified that in the presence of Dr. Till he read the will to the deceased, and asked him if he understood it and he replied that he did and the deceased then signed the will by mark, and he and Dr. Till then signed as attesting witnesses. According to Mr. Burt the deceased was rational on this occasion and in his opinion was of sound mind.

During his cross-examination Mr. Burt testified that Mr. Threatt did not place his mark on the will as a signature until after he and Dr. Till had signed as attesting witnesses.

The evidence introduced by the contestants was directed toward showing that on several occasions prior to his hospitalization the deceased had made statements indicating he was not going to leave a will. Judson Green testified that Mr. Threatt had said he was not going to make a will and that he was "just going to leave everything and let the girls do whatever they feel; if they want to fight over it all right, or whatever they do, it will be all right with me."

On cross-examination Mr. Green stated that Mr. Threatt was a sturdy old character and had a will of his own, and "couldn't anybody influence him or wish-wash him around."

Mrs. Annie Myra Norman, one of the contestants, testified that when the testator was ill he was like a baby and the first one to get to him and treated him like a baby could have gotten the testator to make a will, in fact, Mrs. Norman testified that upon her arrival at the hospital, having been called from her home in Chicago because of her father's illness, she had told the testator he should make a will. On cross-examination Mrs. Norman stated "when he was well—sick or well, you didn't make him, didn't anybody actually make him do nothing."

Mrs. Ruffin, who is the mother of the proponent of the will, testified that her

father had stated to her he was not going to make a will, and upon her telling him that he "couldn't take it with him" he replied, "No, I can't do that, but I can leave it here for you girls to fight like hell over."

There is also evidence tending to show that the proponent and his wife had lived with the testator several years prior to his death. The proponent, Mr. Hubert, was authorized to draw checks upon the deceased's bank account, and he did some work around the farm as directed by the deceased. The evidence further shows that Mrs. Hubert did the cooking for the household and both Mr. and Mrs. Hubert would tend to deceased as his needs would appear.

There is also evidence to the effect that while the deceased could write his name he had on 19 February 1960, signed a power of attorney by mark, he at the time being ill in bed.

Assignments of error Nos. 15 and 16 pertain to the following occurrence during the cross-examination of proponent's witness W. L. Davis:

"Q And Mr. Threatt did not tell you at that time that he was going to make a Will, did he?

"THE COURT: Now, Mr. Howard, you've just been over that; the Witness just said that he didn't. Let's don't repeat over the same thing.

"MR. HOWARD: Is your Honor ruling that I cannot ask him that question?

"THE COURT: Again, Yes; I rule you can't ask him that right now; he just testified that he didn't on that occasion."

As a background to the above ruling, the record shows that on direct examination Mr. Davis had testified that between 18 and 25 December 1960, he had visited the deceased, and that during their conversation "There was something said about a will."

Asked to recount this conversation, Mr. Davis stated that the deceased had inquired as to what the Libby heirs were going to do with the Libby place, and stated he would like to buy it and "make it to Louie" (his great grandson, who is the son of the proponent). The deceased further stated at this time: "The place can be operated until he's 21 years old, and when he is 21 years old he'll take possession." According to Mr. Davis, there was no other conversation about "a will."

On cross-examination and just preceding the ruling now complained of, the record shows the following:

"MR. HOWARD: He didn't testify—the Witness didn't say—you, Mr. Davis, didn't say anything to Mr. Atkeison about Mr. Threatt mentioning the word 'Will', did you?

"A I don't believe I did.

"Q No. And as a matter of fact, you stated that Mr. Threatt told you that he would like to buy that part of that estate and fix it, or make the place to Louie when he got twenty-one (21)?

"A Yes, sir.

"Q And that's all you told Mr. Atkeison about that, wasn't it?

"A About that particular—

"Q (Int.) That's what the conversation was, wasn't it, between you and Mr. Threatt?

"A At that particular time.

"Q Yes; now, actually then, you realized that Mr. Threatt could have made that situation exist so that Louie would get it when he was twenty-one (21) by having him incorporated in the deed, don't you?

"A Well, I don't know all the legal aspects of law."

■ Counsel for appellant argues that the action of the court in ex mero motu in-

tervening to prevent Mr. Davis answering the question "And Mr. Threatt did not tell you at that time he was going to make a will, did he?" was an unwarranted interference with his right of cross-examination. It is counsel's contention that Mr. Davis had testified only that he had not said anything to Mr. Atkeison about Mr. Threatt mentioning the word "will" and his subsequent question sought to show that Mr. Threatt had not mentioned the word "will" during their conversation in question.

We do not accord to counsel's interpretation. The witness had not made his statement merely to Mr. Atkeison, who was examining him on direct, but made his statement as testimony in response to Mr. Atkeison's question.

Mr. Davis had related the substance of his entire conversation with deceased, which was to the effect he would like to acquire the Libby place and "make it over" to his great grandson, and had made it clear there was no further reference to any will. We think it clear from Mr. Davis's testimony that his reference to a "will" was based entirely upon his conception that the deceased's expression in reference to the Libby place constituted his intention to make a will. It is equally clear from Mr. Davis' prior testimony that the deceased on this occasion did not say he was going to make a will.

The question propounded by counsel for appellant was therefore repetitious, and the court did not abuse its discretion in the premises. Newman et al. v. State, 160 Ala. 102, 49 So. 786; Williams v. Alabama Fuel and Iron Co., 212 Ala. 159, 102 So. 136; Morgan v. State, 20 Ala.App. 626, 104 So. 777.

 assignment of error No. 6 relates to the refusal of the court to give contestant's written charge No. 10 which charge is as follows:

"Gentlemen of the Jury, the burden of proof of the proper execution of the will and the proper witnessing of it is on the proponent and if the evidence is equally balanced with regard to such matters, you should find for the contestant and against the validity of the will."

The principle enunciated in this charge was amply covered in charge No. 24 given at the request of the contestants, said charge No. 24 reading:

"Gentlemen of the Jury, at the beginning of this case the mind of each of you should have been in a neutral state with regard to whether or not the alleged will was signed by L. A. Threatt and witnessed in his presence and if the evidence fails to change your mind from a neutral state with regard to these matters, you should find for the contestant and against the validity of the will."

Assignment of error No. 6 is therefore without merit.

Appellant's assignment of error No. 4 asserts error because of the court's refusal of contestant's written charge No. 8.

 Again, the legal principles sought to be enunciated in this charge were amply covered by charges Nos. 15 and 18, given at the appellant's request, and by the court's able and clear enunciation of the principles involved in its oral charge. For these reasons no error resulted from the refusal of contestant's requested charge No. 8.

 All in all, the evidence presented below raised questions of fact well within the province of the jury to resolve, the verdict rendered was amply supported by the evidence and the reasonable inferences therefrom. We find no basis for disturbing the judgment rendered pursuant to the verdict.

Affirmed.

LIVINGSTON, C. J., and SIMPSON and MERRILL, JJ., concur.